Reversed and remanded.

## Ex Parte TATE.

[APPLICATION FOR HABEAS CORPUS.]

1. *Constitutionality of acts of congress repealing substitute laws.*—The acts of congress of the Confederate States, approved respectively on the 5th January and the 17th February, 1864, which repealed and revoked all exemptions previously granted, and subjected to military service those persons who had furnished substitutes under former laws, are not violative of any constitutional provision, but are valid, and within the scope of the powers conferred on the general government. (STONE, J., *dissenting.*)

APPLICATION by Geo. W. Tate, for the writ of *habeas corpus*, to procure his release from the custody of John W. Dubose, an enrolling officer of the Confederate States, who held him subject to the military service of the government. The petitioner alleged, that on the 9th June, 1862, being in the military service of the Confederate States, he procured a substitute, who was accepted in his stead, and he was thereupon discharged, as authorized by the acts of congress then in force; that he was afterwards arrested by said enrolling officer (the time of said arrest not being stated), "under the pretense that he was liable to conscription for the military service of the Confederate States"; that on the 13th February, 1864, he sued out a writ of *habeas corpus* before the Hon. J. R. JOHN, chancellor, at Selma; and that on the hearing, on the 22d February, 1864, the chancellor refused to discharge him, but remanded him to the custody of said enrolling officer. On these facts, which were not

Ex parte Tate.

controverted, the petitioner renewed his application for a discharge to this court.

GEO. W. GAYLE, for the petitioner.—The petitioner procured a valid discharge from the military service of the Confederate States, under the authority of the acts of congress then of force, by putting in a substitute, who was accepted in his stead. This transaction was sanctioned by the government, and the government has received the benefit of it. It thus became a contract, and was supported by a valid consideration. The acts of congress approved on the 5th January and 17th February, 1864, which purport to repeal all exemptions from military service, and to destroy the effect of such contracts of substitution, are inoperative and void, because ·they impair the obligation of contracts.—*Fletcher v. Peck*, 6 Cranch, 87; 1 Pick. 224; 2 Greenl. 213; 2 Peters, 657; 2 Hayw. 310; 1 Murph. 58; 2 McCord, 354; *Winter v. Jones*, 10 Geo. 190. It is said that, though the States are expressly prohibited from passing any law impairing the obligation of· contracts, there is nothing in the constitution which forbids congress to pass such laws. But the general government is the mere creature and agent of the States, and possesses only such powers as are expressly delegated to it, or such as are necessary to carry into effect the delegated powers. There is no express grant to which can be referred the power claimed in this case. To allow the exercise of such power, would be to make the agent greater than the principal, and to establish a consolidated government without limitation. The plea of military necessity might be allowed to a provisional government; but, to tolerate it under a regular constitutional government, whose officers are sworn to obey its constitution, is to subvert all government.

PHELAN, J.—Government is ordained of God, and the powers confided to governors are held in trust for the benefit of the governed. This is essentially true of all forms of government. But in this country, the doctrine has been everywhere openly declared, and lies at the foundation of all our institutions. That the ultimate sovereignty resides

in the people; that they are the rightful source of all power; that governments emanate from them, and are instituted for their welfare and happiness,—are fundamental ideas, which are now received among the American people without controversy.

The powers confided to government in order to fulfill the general object and intention of providing for the welfare and happiness of the people, and specially enumerated in the constitution of the Confederate States, necessarily vary in their nature and character, according to the subjects to which they relate. Among them, the power of war and peace is, beyond question, that which ranks first in importance. The war-and-peace power, it will be observed by glancing at the constitution, is conferred with great care, and in the most ample manner. It is not contained in any one enumerated power, but forms the subject-matter of six out of the eighteen enumerated powers in terms, and of three of the others by necessary implication. I call it the war-and-peace power, not because there is any power so specially named in the constitution, but because the mode of expression is convenient, and will be understood. This war-and-peace power, conferred on the congress of the Confederate States by the constitution, with so much care, and in so ample a manner, is the highest and most vital trust confided to that government; because upon its proper exercise the maintenance and protection of every valuable right, whether of individuals, or the body politic, and involving the very existence of both, must, in case of insurrection or foreign invasion, ultimately depend. It is needless to do more than state a proposition which must command the assent of every mind. War is called the *ultima ratio*,—the last argument—the last reason; because unhappily, in the controversies of nations, when all argument and all reason ends, war begins. The nation which does not mean to submit to the demands of another nation, and has "exhausted the argument," can do nothing but "stand by her arms." With a nation like ourselves, struggling for a national existence with another nation, which affects to treat our struggle as a rebellion, and our people as rebels, the only alternative left is, subjugation or independence.

Well may it be said, then, of us, that not only are life, personal liberty, and property, the trust confided in our instance to the war-and-peace power of our government, but our very existence as a government and people.

To fulfill this high *trust*, we hold it to be the manifest *right*, and the imperative *duty* of the government of the Confederate States, to exhaust, if it becomes necessary, the entire military force of the country, in men, money, and every other available material of war ; *but especially, to hold under its control, and to employ, all the males of the country capable of bearing arms, or of performing other military service.* Though it may not be necessary to fortify this position by authorities, I prefer to let a few of the eminent men who have written on this subject speak.

Vattel (book 3, ch. 2) says : "Every citizen is bound to serve and defend the State, so far as he is capable. Society cannot otherwise be maintained ; and this concurrence for the common defense is one of the principal objects of every political association. Every man capable of carrying arms, should take them up at the first order of him who has the power of making war. *   *   *   * The public authority raises soldiers, distributes them into different bodies, under the command of generals and other officers, and keeps them on foot as long as it thinks necessary. As *every citizen, or subject,* is bound to serve the State, the sovereign has a right to enlist whom he pleases. *No person* is *naturally exempt* from taking up arms in defense of the State, the obligation of every member of society being the same."

To the same effect is Burlamaqui : "The obligation under which subjects are in this respect, is so vigorous and strong, that, strictly speaking, no man can be exempted from taking up arms when his country calls on him for assistance, and his refusal would be a just reason not to tolerate such a person any longer in society. If, in most governments, there are some subjects exempt from military services, this immunity is not a privilege that belongs to them by right ; it is only a toleration that has no force but when there are troops sufficient for the defense of the commonwealth, and the persons to whom it is granted follow some other useful and necessary employment. Excepting this case, in time

of need all the members of the State ought to take the field, and none can be lawfully exempt."—Nat. and Political Law, vol. 2, p. 151.

And Wheaton: "Of the *absolute* international rights of States, the most essential and important, and that which lies at the foundation of all the rest, is the right of self-preservation. This right necessarily involves all other incidental rights which are essential to give effect to the principal end. Among these is the right of self-defense. This, again, involves the right to require the military service of *all its people;* to levy troops, and maintain a naval force; to build fortifications, and to impose and collect taxes for all these purposes."—Wheaton's International Law, 85.

So much for the *right,* and now as to the *duty*: "In the act of association, by virtue of which a multitude of men form together a state or nation, each individual has entered into engagements with all to promote the general welfare; and all have entered into engagements with each individual to facilitate for him the means of supplying his necessities, and to promote and defend him. It is manifest that these reciprocal engagements can no otherwise be fulfilled, than by maintaining the political association. The *entire nation* is, then, obliged to maintain that association; and, as their preservation depends on its continuance, it thence follows, that every nation is obliged to perform the *duty* of self-preservation."—Vattel, book 1, ch. 2, § 16. "The law of God no less enjoins a whole nation to take care of their preservation, than it does private men."—Burlamaqui, vol. 2, p. 157. "It" (the right of self-preservation) "is not only a *right* with respect to other states, but a *duty* with respect to its own members, and the most solemn and important which the state owes to them."—Wheaton's International Law, book 2, ch. 1, § 2.

Mr. Calhoun, following these great authorities, and speaking in special reference to our American governments, uses this emphatic language: "So long as this state of things continues, exigencies will arise, in which the *entire power and resources of the community* will be needed to defend its existence. When this is at stake, every other

consideration must yield to it. Self-preservation is the supreme law, as well with communities as individuals."— Discourse on Government, p. 10..

When stating thus broadly the general principle, that the state has the right to call into the field *all men* capable of bearing arms, we mean it to be understood in reference to that compound system under which we live, and, of course, do not intend to include within the power of the Confederate States those officials of the State governments who may be necessary to the continued existence and practical operation of those governments.

Having established, upon reason and such eminent authority, that it is both the right and the duty of government, in the execution of its high trust (the war power), to exhaust, if necessary for the public defense, or in other words for self-preservation, "the entire power and resources of the community" (Calhoun), embracing "every citizen or subject capable of carrying arms" (Vattel and Burlamaqui), and from which it is said "none can be lawfully exempt" (Burlamaqui); we approach the question by which the application of the petitioner must be determined, and which may be propounded in this form : Is it within the power of the congress of the Confederate States to grant *permanent* and *irrepealable exemptions* from military service, upon *any terms, or any consideration whatsoever ?*

It is manifest, upon looking into the question at large, and the nature of government as considered and settled by numerous authorities, that there are certain attributes of sovereignty—certain high functions of government—which the legislature has no right to give or grant away. They can neither be surrendered nor sold. They cannot be vested in private persons as property, or in the nature of property, by contract or otherwise ; but must be kept and held by the legislature, entire and undiminished, for the benefit of the people—the nation—as public functions and attributes of sovereignty. The opinion is held by many of the first legal minds of the country, that the taxing power of government belongs to this class. But, after a protracted struggle between the authorities of the State of Ohio and the judiciary of the United States, over this question, it

was finally decided by the supreme court of the United States, that the State legislature of Ohio had the power to bind by contract all future legislatures, in fixing by an ordinary act of legislation a limitation upon the taxing power of the State.

The question arose in this wise. The legislature of Ohio, in 1845, passed a banking law, under which a number of banking corporations were organized, which contained a clause fixing the amount of tax the banks should pay during the continuance of their charters. By a subsequent act, passed in 1851, the tax upon the banks was increased. The banks denied the constitutionality of this latter act, insisting that the act of 1845 was a contract, and as such was protected from repeal or alteration by the 10th section of the 1st article of the constitution of the United States, which forbids that any State shall pass laws " impairing the obligation of contracts." The discussion of this question, which was very animated and protracted, as well as very able and instructive, can be found by consulting the following cases: *Debott v. Ohio Life Insurance and Trust Co.*, 1 Ohio St. R. 563; *Mechanics' and Traders' Br. Bank v. Debott, ib.* 591; *Knoup v. Piqua Bank, ib.* 603; *Toledo Bank v. Bond, ib.* 623. The supreme court of Ohio, in these several cases, sometimes varying in the form of expression used, decide in general, among other matters not necessary to notice, this proposition: That the taxing power, which constitutes a branch of the legislative power, and which is of vital importance, and essential to the existence of government, cannot be surrendered or abandoned, either in whole or in part, by the legislature, to promote private and individual interests, so as to limit the power and control of future legislation over it; and that the legislature is incompetent to make any contract or arrangement, whereby the legislative power over it can be to any extent surrendered or abridged.

The cases of *The Piqua Bank v. Knoup,* and *The Ohio Life Ins. and Tr. Co. v. Debott,* were taken to the supreme court of the United States. That court, reversing the judgment of the Ohio court, decided—1st, that the act of Ohio of 1845, chartering the banks, in the clause fixing the tax

was a contract fixing the amount of taxation to which the banks were to be subject, and not a law prescribing a rule of taxation until changed by the legislature; and, 2d, that a municipal corporation, in which is vested some portion of the administration of the government, may be changed at the will of the legislature ; but that a bank, where the stock is owned by individuals, is a private corporation, and that its charter is a legislative *contract*, and cannot be changed without its assent.—16 How. U. S. 369. This decision in *The Toledo Bank v. Knoup* was made by a divided court; Justices Catron, Daniel, and Campbell, dissenting ; the two latter upon the construction given to the act, and Judge Catron from both the propositions.

As one of the results of the reasoning employed in his opinion, Judge Catron lays down the following : " That according to the constitutions of all the States of this Union, and even of the British parliament, the sovereign political power is not the subject of contract, so as to be vested in an irrepealable charter of incorporation, and taken away from and placed beyond the reach of future legislation ; that the taxing power is a political power of the highest class, and each successive legislature, having invested in it, unimpaired, all the political powers previous legislatures had, is authorized to impose taxes on all property in the State that its constitution does not exempt." Although Judge Campbell does not base his dissent upon the ground that no such contract could be lawfully made by the legislature, but only on the ground that, by a true construction of the act, no contract was in fact made, his reasoning is so apposite to the first ground, that I quote a portion of it : " The powers of that assembly in general, and that of taxation especially, are trust powers, held by them as magistrates in deposit, to be returned after a short period to their constituents, without abuse or diminution. The nature of the legislative authority is inconsistent with an inflexible, stationary system of administration. Its office is one of vigilance over the varying wants and changing elements of the association, to the end of ameliorating its condition. Every general assembly is organized with the charge of the legislative powers of the State ; each is

placed under the same guidance, experience and observation; and all are forbidden to impress finally and irrevocably their ideas or policy upon the political body. Each, with the aid of experience, liberal and enlightened, is bound to maintain the State in the command of all the resources and faculties necessary to a full and unshackled self-government."

The question afterwards assumed a new form. In 1851, after the institution of the case of *Piqua Bank v. Knoup and others*, the people of Ohio made a change in their constitution, in which they incorporated an article declaring, in effect, that the legislature should levy a tax on the property and effects of all banks and other corporations, which should make the burden of taxation on them proportionably *equal* to that borne by all other property. This was aimed at the provision in these bank charters, which fixed a certain limit to taxation. The case of *Dodge v. Woolsey*, (18 Howard, 331,) in which the old question was presented under this new aspect, was carried to the supreme court. It was urged, that, as the people of Ohio had changed their constitution, so as to make it the duty of the legislature to make all taxes proportionably equal, and a law had been passed in 1852 raising the tax on the banks in order to carry out this provision, the 10th section of the 1st article of the constitution of the United States, in relation to "laws impairing the obligation of contracts," could no longer apply. But the majority of the supreme court adhered to their former decision, and declared that the provisions of the charter granted in 1845 were still in force. Judge Campbell delivered a very able dissenting opinion, in which Judges Catron and Daniel concurred. We give the following extract from his opinion: "My conclusion is, that the constitution of Ohio, whether it be regarded as the expression of the sovereign will of the people, that the extraordinary exemption granted to these corporations, by which they contribute unequally to the public support, is contrary to the genius of their institutions; or, whether they are inconsistent with a just apportionment of the public burdens; or whether as a declaration of the exigency of the State requiring an additional contribution from them

to its revenue; or a judgment of condemnation of the former government for an abuse of the powers it enjoyed; that it is above and beyond the supervision or control of the judiciary department of this government."

I would refer those who desire to pursue the subject of this Ohio controversy, to the opinion of Bartley, C. J., of Ohio, in the case of *The Toledo Bank v. Bond, (supra,)* in which the decision in the celebrated *Dartmouth College* case (4 Wheaton, 518) is examined and combated, and the whole subject of *legislative contracts* made with corporations is discussed with great fullness and ability.

But, many years before the decision of the Ohio cases, this same question in relation to the taxing power arose and was mooted in the State of New Hampshire, in the case of *Brewster v. Hough,* 10 N. H. 138. In that case, Parker, C. J., holds this language: " The power of taxation is essentially a power of sovereignty, or eminent domain; and it may well deserve consideration, whether this power is not inherent in the people under a republican government, and so far inalienable that no legislature can make a contract by which it shall be surrendered, without express authority for that purpose in the constitution, or some other way directly from the people themselves."

In view of this divided state of legal opinion, I think it may be fairly claimed, that the question, whether the *taxing power* is not one of those great attributes of sovereignty which cannot be finally surrendered or impaired by an ordinary act of legislation, still remains *in dubio,* and the contest over it is open to be renewed at any time, by those who hold that it is, without disrespect to the settled decisions of the courts. One observation to be made here is, that if the same question were made under an act of congress in respect to limitations on the taxing power, it is by no means certain that the same court would feel bound to make the same decision as that made in the Ohio cases· In the first place, the constitutional provision in respect to " laws impairing the obligation of contracts," is in terms limited to the " States," and does not include the United States. In the second place, the war power being surrendered by the States, and confided in the United States, by

the constitution, the taxing power, as an indispensable support of the war power, becomes in the hands of the latter a trust of greater relative consequence and importance to the government of that confederacy .than to any of the State governments. Indeed, Judge McLean, who delivered the opinion of the majority of the court in the case of *The State Bank of Ohio v. Knoup, (supra,)* admits that, but for the constitutional provision, the States would have the sovereign power to annul such a contract.

But, whatever may be the law in regard to legislative limitations on the taxing power, there are unquestionably certain high attributes of sovereignty, which do not allow of any such limitations. Among these may be mentioned the right of *eminent domain.* And what is the right of *eminent domain?* It is thus described by Vattel (book 7, ch. 20): "The right which belongs to the society, or to the sovereign, of disposing in case of necessity, and for the public safety, of all the wealth contained in the State, is called the *eminent domain.*" Under the provisions of the constitution of the Confederate States, one limitation, and one only, is placed on this right; and that is the provision which declares, that "private property shall not be taken for public use, without just compensation."—Art. 1, sec. 7, § 13. With this limitation, there is nothing which bears the nature of property, whether real or personal, corporeal or incorporeal, which may not be taken and used under it, for the public good in peace, or the public defense in war. The books are full of cases involving the question of its nature and extent; and the current of decision is uniform and unbroken, that no limitation can be placed upon it by any power or right, private or public, but that which has been named. It cannot be surrendered by legislative grant, or contracted away for a consideration, under legislative contracts. One legislature cannot vest in its grantees or beneficiaries land, or goods, or corporate franchises, no matter what may be their nature or kind, so securely that a succeeding legislature cannot take and appropriate them afterwards for the public use, if necessity requires, upon making compensation; and of the existence of such necessity, each succeeding legislature must be the judge.

And the reason for this is, that no matter who may be the holder of property, nor how solemnly any legislature may have declared their intention that its grantees shall have an exclusive right to the enjoyment of that property, whether it be a tract of land, or the franchise of a railroad company, such legislation cannot make them more or less than private property at last, and this great attribute of sovereign power holds all property subject to be taken for public uses when the common welfare of the community requires it. What sort of government would that be, which did not hold under its constant direction and control the great public interests which stand connected with our roads, bridges, ferries, turnpikes, railroads, and canals; our jails, penitentiaries, court-houses, and capitols; our market-places, streets, and wharves, in towns and cities; our asylums, hospitals, cemeteries, and public seminaries of learning; and, as more immediately connected with the public defense, our forts, arsenals, armories, and navy-yards? Without this power, it would be a government not worth the name; it would be wholly unequal to the purposes of government. And if, by legislative contract, or otherwise, one private right could be fastened on the free exercise of this power, then another might follow, and another, when the precedent was once set, which would result in its ultimate practical subversion, and the public good would be made, in the end, subservient to private interests, always watchful, and always selfish. To close at once the door to all danger of the kind, the doctrine has been established, that this high function of government is a trust, which the legislative power as trustee has no capacity to give away or contract away; that the nature of the trust requires that it should be held by government to be used, and that it must remain in full and vital force, to be put into exercise whenever the public good shall require, unembarrassed by claims of private rights.

The doctrine of eminent domain was largely discussed in the case of the *West River Bridge v. Dix et al.*, (6 Howard, 507,) which case went to the full extent of deciding, that not only the land and other material property of an incorporation might be taken, but their franchise also. It

was much insisted upon by the counsel for the bridge company in that case, that the taking of their property and franchise was in violation of the constitution of the United States, forbidding the States to pass " any law impairing the obligation of contracts." The observations of Judge Daniel, who delivered the opinion of the court, are so strong and well expressed on this point, that I quote them : "No State, it is declared, shall pass a law impairing the obligation of contracts; yet, with this concession constantly yielded, it cannot be justly disputed that, in every political sovereign community, there inheres necessarily the right and the duty of guarding its own existence, and of promoting the interests and welfare of the community at large. This power and this duty are to be exerted, not only in the highest acts of sovereignty, and in the external relations of governments; they reach and comprehend likewise the interior polity and relations of social life, which should be regulated with reference to the advantage of the whole society. This power, denominated the *eminent domain* of the state, is, as its name imports, paramount to all private rights vested under the government, and these last are, by necessary implication, held in subordination to this power, and must yield in every instance to its proper exercise. * * * * Now, it is undeniable, that the investment of property in the citizen by the government, whether made for a pecuniary consideration, or founded on conditions of civil or political duty, is a contract between the state, or the government acting as its agent, and the grantee; and both the parties thereto are bound in good faith to fulfill it. But, in all contracts, whether made between states and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations, and of the community to which the parties belong ; they are always presumed, and must be presumed, to be known and recognized by all ; are binding upon all, and need never therefore be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as

conditions inherent and paramount, wherever a necessity for their execution shall occur. Such a condition is the right of *eminent domain*."

These principles have been settled in a great number of cases; and it is believed that no respectable authority can be found which conflicts with them.—See the following cases: *Charles River Bridge v. Warren Bridge*, 11 Peters, 546; *Beekman v. S. & S. Railroad*, 3 Paige, 45; *Rogers v. Bradshaw*, 20 Johns. 742; *Boston Water P. Co. v. Worcester R. R.*, 23 Pick. 360; *Tuckahoe Canal case*, 11 Leigh, 75; *Crosby v. Hanover*, 36 N. H. 404; 7 N. H. 35; 10 N. H. 138; 7 Foster, (N. H.) 183; *Dyer v. Tuskaloosa Bridge Co.*, 2 Porter, 297; *Young v. McKenzie*, 3 Kelly, (Geo.) 31; 2 Gray, (Mass.) 2; 14 Illinois R. 314; 31 Penn. R. 37; 1 Sneed, (Tenn.) 176.

A question here presents itself, the answer to which must determine this controversy. Do not all states possess a sovereign attribute, by which they have the right to command and control the personal services of their citizens, for the public defense, in case of war or insurrection, which is not distinguishable in principle from the right of *eminent domain* over property? That they have the right, and that it is their duty, if the public safety requires, to call into the field their entire male population—"all men"—"every man" —"every resident citizen or subject"—the authorities we have already quoted conclusively prove. Wheaton says, the state "has the right to require military service of *all its people*;" Vattel, that "*every man* capable of bearing arms should take them up at the first order of him who has the power of making war," and that "*no person* is naturally exempted from taking up arms in defense of the state;" Burlamaqui, that "no man can be exempted from taking up arms, when his country calls on him for assistance;" Calhoun, that "exigencies will arise, in which the *entire power and resources of the community* will be needed to defend its existence. When this is at stake, every other consideration must yield to it. Self-preservation is the supreme law, as well with communities as individuals." The reason for giving to the right this broad and sweeping extent, is pithily stated by Mr. Monroe, as quoted in *Jeffers v. Fair* (32 Geo. R.) : "The

commonwealth, he says, has a right to the services of *all* its citizens, or rather, the citizens composing the common-wealth have a right, collectively and individually, to the service of *each other*, to repel any danger that may be me-naced." This agrees with Vattel, where he says, "Every member of society is obliged to serve and defend the state, as far as he is capable. Society can not otherwise be main-tained; and this concurrence for the common defense is one of the *principal intentions* of every political association." Upon reason and authority we find, then, that the right of government over the persons of its citizens, for the public defense, is as broad and unqualified as language can make it, and fully equal in degree to that existing over property by the right of *eminent domain*, because it comprehends *all*, and the right over property can go no further.

When we come to consider the nature of the trust con-fided to government in the due exercise of this great power, it must be confessed that this is of higher importance than that over property, because the latter relates mainly to the proper administration of affairs and the well-being of the state in time of peace, and the former to the very existence and preservation of the state when threatened with war and subjugation; and if it be incompatible with the nature of the one, as has been conclusively shown, to suffer any posi-tive diminution or limitation, even under the influence of the most solemn legislative contracts, the same principle must hold good, with even greater reason, in case of the other. If it has been wisely determined, that one legisla-ture has not, and can not have, the power to bind succeeding legislatures, by contract or otherwise, so as to exempt ab-solutely any property, real or personal, from the right of *eminent domain;* what reason can there be, on principle, in holding that one legislature shall have the power to bind its successors, by irrepealable exemptions, from exercising that more vital and essential sovereign attribute, the right to call into the field every citizen of the state, should the public safety require it? Does a man cease to be a *citizen*, because the law, for reasons of public policy, gives him for the time an exemption from military service? Until he ceases to be a *citizen*, with the rights and the duties which

Ex parte Tate.

appertain to citizenship, he can not exonerate himself, nor be exonerated by the legislative power, from the obligations which inherently attach to that relation.   Protection is his right, and allegiance his duty, so long as he remains a citizen; and the highest duty of allegiance is to respond to the call of his country for soldiers, when her liberty, including his own, is threatened, and her existence endangered by an invading enemy.   Although the legislature, for reasons of public policy, may have granted him an exemption, he no more ceases, by reason of such exemption, to hold the relation of *citizen* to his state, and so liable to military duty, if the public safety under new exigencies shall need his services, than property ceases to be property, because it may have been clothed with the exclusive privileges of a franchise created by legislative contract.   The franchise is subject to the right of *eminent domain*, like all other property, by an implied condition, which necessarily entered into the contract by which it was created, if the public good required it to be taken.   The citizen, in like manner, is liable to the call to military service, as a citizen, if new exigencies should arise, notwithstanding he may have been exempted; and if he claims exemption under a legislative contract, the answer is, that in every such contract there is an implied condition, that any succeeding legislature, acting in good faith, and for the public safety, should have power to repeal such exemption.

Precedents and decisions on this subject are not common, for the question has never been brought to a decision in England, so far as we can find, and in this country very rarely until lately.   Although the principles which govern the case, as we have shown, are old, and long established, there seem to have been few occasions on which it was necessary to give them application.   This may have arisen from the fact, that it has been rarely found necessary to revoke exemptions alleged to be founded on contract; or from the fact that, in view of those fundamental principles which govern the relation of citizen and state, few have thought it necessary to contest the sovereign attribute in subordination to which all exemptions are, and must ever remain, revocable.

There is one American authority, however, a decision made many years ago in Massachusetts, which bears upon the question. That is the case of the *Commonwealth v. Bird*, 12 Mass. R. 442. In 1793, the legislature of Massachusetts passed an act, declaring that all persons, who had "held the office of a subaltern, or officer of higher rank," under the government of the United States, or any of the States, were exempted from militia duty. Bird had acquired an exemption from militia duty under this statute, by being a lieutenant of cavalry, which office he had held nearly two years. In 1800, the legislature repealed the former law, and declared that no officers should be exempt, but such as had completed a term of service of five years; but with a proviso in favor of those who had already acquired exemptions. Under this act, Bird was still exempted. But, in 1810, another law was passed, including all who had not performed service for five years. Bird claimed his exemption, upon the ground that an exemption once granted, in consideration of public services performed, could not be destroyed or taken away. The court said:

"The only question, therefore, is, whether the legislature had power, under these circumstances, to revoke the exemption formerly enjoyed by Bird, and to require him to do duty among the conditional exempts. We are not prepared to say that one set of legislators can control their successors to this extent, in a case of such vital importance to the commonwealth. There may, undoubtedly, be cases in which it might be deemed a breach of the public faith to revoke such exemptions; and it is not to be supposed that the legislature would do it, in any case, without very powerful motives. But we are not authorized to weigh those motives, or to suffer them to have any influence on our decision, when the law is clearly and unequivocally expressed. We cannot, in this case, allow the exemption claimed by the respondent, without deciding that the legislature cannot, under any circumstances, require the services of an individual who has once been exempted. We must say, that an able-bodied citizen, whose services in the militia have been dispensed with, or commuted, in time of peace and tranquillity, can never afterwards be compelled to lend his

aid to the government, although the existence of the State may be threatened by the most formidable foreign or domestic enemy. We can see no principle on which the exemption in this case could be allowed, that would not also involve a case like that here supposed. This would be carrying those exemptions to an extent that never could have been contemplated, either by the legislature who granted them, or by the citizen who performed the conditions prescribed by the law."

This case, and the grounds taken in the opinion of the court, I hold to be a good authority to show that all exemptions from service are revocable. By the same rule, and the same reasoning, the legislature could revoke the exemptions even of those who had performed service under the law of 1810, for the full term of five years; and yet that would as clearly be an exemption under a legislative contract, as in a case of *substitution*.

Military exemptions commonly are not, and rightfully and lawfully cannot be, granted as a boon or privilege. They proceed on the ground of public policy, and are intended to subserve the public interests. All men cannot go to the field, even those who are able-bodied. The country, in war, as well as in peace, indispensably requires that a large number of such men should remain at home, to govern the state, and keep in active operation agriculture and the mechanic arts, and the interests of education and religion, as subsidiary to the great work of defending the public liberties. Such exemptions, as they ought never to be granted except on grounds of public policy, so ought never to be revoked except upon the like ground of public policy. Mere grace and favor in granting, or mere caprice and oppression in revoking, are unworthy motives not to be imputed to the legislature. It is their duty (and to this, and this only, are they bound), to deal with the whole question in good faith, as the representatives of the people, holding in their hands the high and solemn trust of defending to the best of their abilities the liberties of the country. And if they but observe good faith, there can be no exemption granted, but what may be revoked by the same or a subsequent legislature.

It would exhibit a strange adjustment of the principles and powers of government, if it can be laid down as law, (see authorities *supra*,) that all the money in the world could not suffice to purchase, even through the solemn formalities of a legislative contract, the exemption of a piece of land from being taken by the state for a road, or a bridge, or the site for a fort, if the public good required it; and yet that an able-bodied citizen could be allowed by law to buy, for a few dollars, an absolute exemption from the military service of his country, although that country might at the time be engaged in a death-struggle to maintain his liberties and its own existence. If that be law, push it to its consequences, and let us see how it will appear. Here is a class of exempts, with their discharges in their pockets; and there is a body of their fellow-citizens, with no more personal rights to protect, and probably, in proportion to numbers, less property, engaged in deadly combat for the common liberties of the country, and withal too few in numbers to cope with the enemy; and yet the legislature is utterly powerless to compel the former to render assistance. Such a phase of the case shocks us by its inconsistency and inequality. Its odious and unequal character goes far to persuade the judgment that there can be no law for such a case; that it is irreconcilable with justice and sound policy, and therefore is not law. To avoid all possible contingencies of the kind, we go back to fundamental principles, and say that the high and solemn trust confided to the legislature, in the possession and exercise of the war power, it cannot surrender or sell; it cannot abrogate or relinquish; and that all laws granting military exemptions, must be taken with the complied condition, that, if. the public safety shall require it, they may be revoked and set aside.

We have not deemed it necessary to discuss the question, whether or not, under a proper construction of the act of congress which grants exemption to those who furnish substitutes, the power is left in congress to revoke at pleasure such exemptions by virtue of the act itself. Differences of opinion on this question, it is manifest, prevail in the country; and as there were, in our judgment, higher and firmer

grounds on which to base a decision, we have preferred to waive the discussion of that question. The principles on which we rest our decision equally apply, no matter what may be the construction given to the act.

I sum up the views we hold on the questions involved in this inquiry, in the following propositions :

1. That the war-and-peace power, conferred on the congress of the Confederate States by the constitution, is the highest and most vital *trust* confided to that government; because upon its proper exercise the maintenance and protection of every valuable right, whether of individuals or the body politic, and involving the very existence of both, must, in case of insurrection or foreign invasion, ultimately depend.

2. That, to execute this high *trust*, it is the imperative duty, as it is the manifest *right* of that government, to exhaust, if it becomes necessary, the entire military force of the country, in men, money, and every other available material of war; but especially to hold under its control and to employ all the males of the country capable of bearing arms, or of performing other military service.

3. That, in view of this high *trust* and this great correlative duty, conferred and imposed upon that government for the public defense and the preservation of life, liberty and property, it is not in the power of any congress to grant *permanent* and *irrepealable exemptions* from military service, upon any terms, or any consideration whatever; but that all exemptions granted by congress, must be taken under the implied condition that, if the exigencies of the country require, they may be revoked and set aside; and that each successive congress must be the judge of what the public defense and the necessities of the country from time to time require.

4. Proceeding upon these principles, we decide, that the act of congress of January 5th, 1864, which declares, "that no person shall be exempted from military service by reason of his having furnished a substitute," and the act of February 17th, 1864, which repeals all previous exemptions, both have the effect of repealing so much of the act of April 16th, 1862, as allows an exemption to any one fur-

nishing a substitute, and are constitutional and valid ; and that the petitioner in this case is now liable to military service, agreeably to the provisions of said acts of January 5th and February 17th, 1864, notwithstanding he had furnished a substitute.

The decree of the chancellor, refusing to discharge the petitioner, is affirmed.

STONE, J.—While it is not my intention to write a dissenting opinion in this case, I wish it understood that I do not commit myself to the opinion or arguments of my brothers. I wish this published with the opinion of the court, if I do not file a more extended opinion.